We'll hear argument now in the case of Mason-Funk v. City of Neenah. Thank you, Your Honor. May it please the Court. Mr. Reddin. Now we're ready. We generally allow counsel to find a seat. May it please the Court. This is a Section 1983 case in which Michael Funk, the appellant Teresa Mason-Funk's husband, was taken hostage at a shop in Neenah, Wisconsin. Police were called to the scene. They were told it was a hostage situation. They, including Officers Hoffer and Ross, who are two of the respondents in this case, were told that there was a single hostage taker and multiple hostages. The police, as set by Neenah police rules, was obligated to protect innocents, hostages, even if it meant the risk of their own lives. But when Mr. Funk tried to escape from the hostage taker via the alley behind the shop, Officers Hoffer and Ross shot and killed him. The District Court correctly recited the summary judgment standard, but the District Court then failed to apply it. Instead, the District Court concluded that the officer's decision to shoot Mr. Funk was constitutionally reasonable as a matter of law. Mr. Reddin, my principal question in this case is how one could, how your client could overcome a defense of official immunity. Official immunity applies unless the officers have violated clearly established rights. This is a case where a U.S. District Judge, after full opportunity for briefing, found they hadn't violated any rights at all. How are we supposed to say that the District Judge is so clearly wrong that any reasonable officer would have known that the U.S. District Judge was completely out to lunch? As to the District Court's evaluation of whether rights were violated, Your Honor, the core of our case, which I will call the merits phase of the case, is that there was disputed evidence. I understand that, but the District Judge thought that on the evidentiary record, your client lost on the merits. And now in order to get a reversal, what you have to persuade us is that an officer in the heat of a hostage situation, officers who have just been fired at, had to know that it was clearly established that what the U.S. District Judge later thought was crackers. How can that be right? Three reasons, Your Honor. First of all, the District Court's decision indicated the District Court felt that it was our burden to show one case, which was, if not on all fours with this fact situation, close enough that it provided clear guidance to the officers. That is not the law under Hope and subsequently decided cases. If you have a robust collection of cases... I don't think you're getting my question. Forget what the District Judge said about immunity and address the question I asked about immunity. Has the Seventh Circuit ever held that when a District Judge says on the merits that the defendants were entitled to do what they did, that nonetheless the law was clearly established, that so clearly established that the District Judge was wrong, that damages can be awarded? That's the question I asked you. Your Honor, whether qualified immunity exists depends on the underlying facts. I wish you would address my question. If you are just not willing to answer my question, I will, of course, draw the appropriate inference. Perhaps I'm not understanding your question, Your Honor. I've asked it three times now. Has this court, has any court held that the law, that when a District Judge says the law is X, that the law is so clearly established the other way that damages are permissible? So clearly established the other way that damages are permissible. Yeah. Damages are permissible if the law is clearly established the other way. I would respectfully submit here the question is whether, under facts that could be found, the law was clearly established. The Supreme Court once said that immunity is appropriate whenever federal judges disagree about the merits. If we reject the District Judge's view of the merits, we will have a situation in which judges disagree about the merits. That, one would think, is a functional definition of the law not being clearly established. And as I said, that's what the Supreme Court once said was the standard for immunity. Your Honor, if the District Court finds that the facts are indisputably such that they support qualified immunity and if the District Judge is correct, then I would agree. In that case, qualified immunity applies and the case is over. But to me, the core issue here is was the District Court's conclusion that based on the facts, the law was the other way, that there had to be qualified immunity? Your Honor, I would respectfully disagree with that. The core of the merits part of our case is the District Court's conclusion that the facts compelled qualified immunity is erroneous. The District Court weighed and sifted evidence. There was other evidence in the record from which a jury could have found facts that would establish under clear case law, which is cited in the qualified immunity portion of our briefing, that there is no qualified immunity, that the officers were on notice of facts if those facts are found in a certain way by the jury, that what they did was unconstitutional, that it was unreasonable use of force. If I may continue, Your Honor, I'd just like briefly to review what we think it was that the District Court did as far as weighing and sifting of the evidence goes. There are three basic aspects of the facts that govern the question of whether there was constitutionally unreasonable use of force. One is were the officers reasonable in believing that Mr. Funk was a perpetrator rather than an innocent? There is case law, particularly the Horiyuchi case, that put Officers Hoffer and Ross on clear notice that in a situation where they have information, as they did here, that there were innocents and perpetrators, they have to make every reasonable effort to distinguish between the two. They can't just go into a chaotic situation in a shop where a jury could find they had no factual basis for believing that Mr. Funk or everybody else in the building was a perpetrator. They have to make an effort to distinguish they didn't do that here. Case law also establishes, concerning Mr. Funk's behavior in the alley, that the fact that Mr. Funk had a gun and the fact that at one point he was turning briefly in the officer's direction is not in and of itself enough to create an imminent threat. The case law establishes that there has to be something more than that. There has to be threatening conduct, for example, a direct threat toward the officers or toward somebody else. Pointing of a gun, charging the officers, running directly in their direction. There was evidence that the district court discounted. We think that it was a jury's function to weigh that evidence, indicating that this was not the situation. Again, the officers knew there were hostages. We believe it was not reasonable for them to come to the conclusion, when Mr. Funk was in the alley, that he had to be a bad guy. There is evidence, particularly the videotape, that shows that Mr. Funk, who could have been and there was a definite possibility at this point that he was a hostage. They could not say as a matter of likelihood that he was not a hostage. There was evidence he did not point the gun at anybody. He did not run at the officers. A telling thing is at the time Mr. Funk was shot, it was not when he was approaching the officers. There is evidence from which the jury could find he was running sideways to and away from the officers. Officer Hoffer himself said, he was running at 90 degrees to me at the time I shot him. The final thing is the warning requirement. The Garner case says that you have to give a warning before using deadly force unless a warning is unfeasible. We agree Garner itself is not guidance to Officers Hoffer and Ross with sufficient specificity to cover constitutional requirements. But the thing is there are other cases which made it clear that under the circumstances of this case they did have to give a warning. Cases like Horiuchi and Cooper put the officers on notice that you have to give a warning before using deadly force except in a very narrow set of circumstances. For example, where a subject is shooting at somebody or is pointing a gun or has indicated that he will fight or flee regardless of what the officers might do. There is evidence in the record from which a jury could find in this case that situation did not exist. Mr. Funk was not targeting anybody. There is evidence to that effect. He was not pointing a gun at anybody and he had not indicated that he would flee regardless of what the officers did simply because they never gave him a warning, alerted him that they were in the area and that he should surrender. So I think with that I would just conclude by saying this. There is evidence in the record from which the jury could find that it was unreasonable for the officers to come to the conclusion based on the information they had that Mr. Funk was a bad guy, not a good guy. There is evidence from which a jury could conclude there was no imminent threat. Again, there is evidence particularly on the videotape that shows Mr. Funk was not targeting anybody. He was not charging at the officers. At the time he was shot, he was running sideways to and away from the officers. That's not somebody who's imposing an imminent threat, at least a jury could find as much. And finally, once again, there is evidence from which the jury could find that because there was no such threat, a warning could and should have been given, and perhaps the most telling piece of evidence that would support a jury in that conclusion is Officer Hoffer's testimony that he gave a warning, that he thought he gave a warning, even though it's undisputed that he didn't give a warning. So Judge Easterbrook, again, and I apologize if I am not getting your question fully, but what I am trying to say here is the district court found that under the facts there was qualified immunity here, but we submit the district court found those facts by taking a very selective view of the evidence, by taking the evidentiary weighing and sifting process out of the jury's hands. We think that was improper, and we ask you to reverse the district court and remand this matter for trial. Unless any of your honors has any other questions, I'll reserve my time for rebuttal. Certainly, Mr. Rennie. Mr. Gunther. Thank you, Your Honor. May it please the court, my name is Greg Gunther, and I am here with co-counsel Tom Armstrong, and we represent Officers Hoffer and Ross. We would not be here today under any set of circumstances but for the fact that Thomas Funk appeared in the alley outside of the hostage situation with a gun in hand because had he not appeared in the alley with a gun in hand, he would not have been shot. The very first person Officers Hoffer and Ross saw after being shot at twice and hearing a third barrage of gunfire in the alleyway was Mr. Funk in the alleyway brandishing a weapon, standing by the back of a pickup truck that was adjacent to the motorcycle shop. It was the drawn handgun that led the officers to reasonably believe that Funk was not a hostage but a perpetrator who had on two previous occasions, and we're talking a very short period of time here, Your Honors, we're talking minutes, between the first shots that were fired at the law enforcement officers and when they saw Funk in the alley with a gun. Now this situation was an unsecured hostage situation. What I mean by that, the area was not secured. It was called a hasty team that went in to try to save the hostages. What did you call that? A hasty, like hasty, to act in haste. And they were quickly assembled by the supervisor on scene, the officers that were there. They had a five-minute countdown they received from the dispatcher that said, if you don't, if someone doesn't get here, the hostage taker, no one knew who the hostage taker was, is going to start killing people inside here. Then there was a one-minute countdown where if you're not here in one minute, the hostage taker is going to start killing all the hostages. So an assembly of officers was put together in the most heroic of natures and entered the back door of the motorcycle shop, not knowing what they were going into in an attempt to save the hostages. It's at that time that the warning and the indication from the officers to the people inside was given, and the first warning was, police, show us your hands, get down on the ground. That was returned with a barrage of gunfire. That barrage of gunfire and the smoke-filled room during this, two officers fell down a flight of stairs. Officer Hoffer, a defendant in this case, was shot in the head, except he hit his helmet, and by the grace of God, the bullet didn't go through his helmet and kill him. Within two minutes after that took place, another officer yelled inside, if anyone in there can hear me, talk to me, and another barrage of gunfire came out at that officer. So the officers ran to two sides of the alleyway, one to the south and one to the north. Within a minute or so, another barrage of gunfire comes out of this place, and that gets the attention of Hoffer and Ross that are at the south side of the alleyway. There's no one else in the alley. There's no officer in the alley, some are to the north, some are to the south. After this next barrage of gunfire comes, the officers then look around a corner at a place called Vickie's on the south end, and they look around the corner behind an officer that's got a shield, and they step out into the alley, and they see Funk. They don't see the front of Funk. They see the back of Funk, and they both have testified that it looked like he was assessing targets, like he was moving as if he were looking for targets. In fact, the next thing that happened, and this is in three— now I want to count this down for you. From the first moment that the officers saw Funk in the alley after the three barrages of gunfire, there was 945-36 and 945-37. That one second is when they saw Funk in the alley. In the next second, 945-38, they see he's got a gun. They notice he's got a gun, and my God, who is this guy? They start processing this. Who is this guy? Is he a hostage? Is he a perpetrator? He's got this gun. What do we do? We have to cite him in. Within two seconds, and no one disagrees on this, they had to process in the entirety, was this guy the guy who shot at us? Who else would be in that alley with a gun but the perpetrator? And with that processing and that going through, within those three seconds, they made the decision, since this site was unsecured and they were exposed, to shoot Mr. Funk. Is there something that, of course, this is sort of my reaction, so it may not have been theirs, that somebody who comes out of there with a gun, why he didn't use it while he was in there if he's not a perpetrator? He may have used it while he was in there. There was a barrage of gunfire right before the scene. So there is a possibility that actually he was part of a gunfight? There is absolutely. That's a reasonable assessment an officer could make, was that remember what shortly before the officers saw Funk in the alley, there was gunfire within the building. Next thing they do is they see Funk in the alley. So you say there is a possibility that Mason Funk did actually shoot at this guy? No, in reality, no, no, no, no, no. It's from the officer's perspective I'm giving this to you. Well, I guess from my perspective, if you're in there and a guy, of course, they're waiting for somebody else. They weren't threatened personally, at least supposedly. And this guy's got, what is it, a machine pistol? No, actually it's not a machine pistol. That was a bad description of it. This was not a MAC-10 fully automatic pistol. So it's not one of those. But whoever it is, there's one guy with the gun, and then it turns out in hindsight there were two people in there with a gun. Yes. One of them was trying to get out of there, and he got shot. Correct. And that's when the court determined it was qualified immunity. Yes, they found on the merits qualified immunity applied, that the officers in that situation, that their determination was reasonable from a Fourth Amendment perspective and from the full analysis of qualified immunity. The one thing that appellants have absolutely failed in this case with so far, because none exists, is to come up with a like-similar circumstance or situation, a case that would put officers on notice, that when you're in a hostage situation and you've taken multiple gunfire and someone appears in the alleyway and has a gun immediately after gunfire, that you should somehow objectively, reasonably not think that that's a hostage, not think that that's a perpetrator and is a hostage. And remember, in this court, Your Honors, in this case, Your Honors, there was oral argument also in front of Judge Griesbach in this case. It wasn't as if he came to this decision on the merits, on a summary judgment in a vacuum. I mean, both sides were there. We were there arguing for over an hour. I'd like to address, if I just can a second, one issue. I think that's very important. Because of this three-second timing and the quick aspect of what these officers had to make and determine in their minds, there's a processing that takes place, as we all know, and I know that you've heard cases along shooting cases before and cases where officers have to process what's happening. Well, you know, three seconds is almost an impossible time period to fully process. And when they saw a thump with the gun in hand, making a turn towards that, as this court said in Eagle Bear, you don't have to wait until the gun is pointed right at you or firing at you before you take affirmative steps to stop that. And that's what they did. It was a mistake. Yes, it was a mistake, but it was a reasonable mistake. Who would believe that someone would come out of a hostage situation where multiple gunfire was with a gun in their hand? He made no further efforts at all to raise his hands, to drop the gun, to do anything. He just grabbed it. He was with the gun, and he starts spinning and going towards the officers. And I believe that the court was correct, the district court, when they analyzed that case. Now, on the issue of warning, appellants cite the Halstead case. And, frankly, Halstead v. Scottsdale out of the Ninth Circuit, the facts and circumstances of that case are so different from ours that it's almost hard to conceive that it would be used as an analysis in this particular case to put these officers on notice of anything as far as having to give a warning. In Garner, there's that very brief statement about a warning when feasible. And the Supreme Court hasn't expanded on that, and no one has really expanded on that at an appeals court level, at least in this district. And what we have to look at is just what was cited, though, by the plaintiffs, and they cite Halstead. And in that case, there was a man who was inside of his home, and he was threatening to pile drive one of his children, unless his father showed up. So he picks up this young boy, puts the young boy over his head, and is ready to pile drive him, and comes out, and the officers see him. And he's outside with that child, walking about for over eight seconds. In our case, it was a minimum of three seconds that the officers had to respond. In that case, there was no sudden action. The Halstead court said, this is the Ninth Circuit, there was no sudden action by him, the guy holding the kid up in the air, and he didn't drop him or move him around. In our case, there was a sudden action, the turn towards the officers. And there was no weapon in the Halstead case relied upon by appellants. In our case, there clearly was a weapon. And in our case, officers clearly felt that this weapon was a threat to kill them if they didn't act quickly. I really, unless there are some other questions, I could go on, but hearing myself speak is the most important thing for me to do, so I would be happy to entertain any questions you may have. I believe that you should affirm the decision of the district court, which was summary judgment on the merits, and that these officers were entitled to qualified immunity. Thank you. Thank you, Mr. Gunta. Anything further, Mr. Rennie? Very briefly, Your Honor. Mr. Gunta's discussion of the merits would be an excellent closing argument before a jury, but the fact is there's another story that the jury could believe on a reasonable weighing and sifting of facts. The jury could conclude that the officers came to the scene, the information they were given was one hostage shooter or one shooter and multiple hostages. They came to the incident knowing that the police department's policy was you have to protect innocents, you have to go the extra mile, even if you put your own life at risk. The jury could find it was dark and chaotic in the shop. Nobody could see. I think the officers admitted they could not tell who was shooting. It was not reasonable for them in a situation with one shooter and multiple hostages to assume that anybody that comes out of that building has to be a bad guy. Mr. Gunta also put great emphasis on, for example, the fact I think he even gestured with painting a picture that Mr. Funk is running at the officers at the time he was shot. The videotape shows different. A jury could find differently he was running at a 90-degree angle to them, perpendicular and away from them. He had not stopped running in their direction. He was running away from them at that time. As far as the warning goes, Mr. Gunta puts great emphasis on Halstead, says that's not constitutional guidance for purposes of avoiding qualified immunity because the facts were different. But that goes back to the fact that under HOPE you don't have to present a case that is on all fours. What Halstead and also Horiyuchi do is very clearly state there is a narrow category of cases where you don't have to give warnings, and that's limited to where there's a direct threat, where the person in Mr. Funk's position is shooting at somebody, making threats, approaching somebody, putting it in a situation where literally seconds matter. There is evidence to the contrary here. If a jury found that way, that there was no imminent threat, then the fact that there was no warning given constitutes a violation of the clear notice that Horiyuchi and Halstead gave. And I think with that I will conclude my rebuttal. Thank you very much, Counsel. The case is taken under advisement.